IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JAMES SMITH,

        Plaintiff,

v.

LIFE INSURANCE COMPANY OF
NORTH AMERICA,

        Defendant.

CIVIL ACTION NO.
1:05-CV-2215-JEC

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

SEP 2 8 2006

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

## ORDER & OPINION

This case is presently before the Court on Plaintiff's Request for Oral Argument on Defendant's Motion for Summary Judgement [9]; Plaintiff's Motion for Summary Judgment or, in the Alternative, for Preliminary Injunction [11]; Defendant's Motion for Summary Judgment [12]; Plaintiff's Motion to Strike Portions of Affidavit of James Lodi [16]; Motion to Correct the Reply Memorandum in Support of Defendant's Motion for Summary Judgment [22].  The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that Plaintiff's Request for Oral Argument on Defendant's Motion for Summary Judgement [9] should be **DENIED;** Plaintiff's Motion for Summary Judgment or, in the Alternative, for Preliminary Injunction [11] should be **GRANTED;** Defendant's Motion for

Summary Judgment [12] should be **DENIED**; Plaintiff's Motion to Strike Portions of Affidavit of James Lodi [16] should be **DENIED as moot**; Motion to Correct the Reply Memorandum in Support of Defendant's Motion for Summary Judgment [22] should be **GRANTED**.

## BACKGROUND

Plaintiff James Smith brings this action pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.* to recover long term disability ("LTD") benefits plaintiff contends are due under a LTD plan sponsored by Technology Solutions Company ("the Plan" or "the LTD Plan") issued by defendant Life Insurance Company of North America ("LINA"). Plaintiff seeks not only to recover LTD benefits, but also to clarify his rights to future benefits under 29 U.S.C. § 1132(a)(1)(B). In addition, plaintiff seeks equitable relief under 29 U.S.C. § 1132(a)(3) in the form of an injunction prohibiting LINA from reducing or offsetting his disability benefits. (Compl. ("Compl.") [1] at ¶ 1.)

The benefits under the Plan were funded by Group Policy Number FLK-008143, which was issued by LINA to TSC, with an effective date of April 1, 1995 (Administrative Record ("A.R."), attach. as Ex. 2 to Mem. in Supp. of Def.'s Mot. for Summ. J. (hereinafter "Def.'s Summ.

2

J.") [12] at 834-814.[1])   LINA is both the claims administrator and the insurer.   (*Id.*)

Under the terms of the Plan, plaintiff is entitled to LTD benefits for so long as he remains "disabled" as defined by the Plan. (A.R. at 827, 821.)   Both parties agree that, on May 17, 2002, plaintiff became disabled within the meaning of the Plan as a result of a severe head-on collision. (Def.'s Summ. J. at 4; Plaintiff's Motion for Summary Judgment or, in the Alternative, for Preliminary Injunction, ("Pl.'s Summ. J.") [8] at 3; Defendant's Answer ("Ans.") [3] at 15; A.R. at 771.)

The impact of the collision shattered the bones of plaintiff's left hip, pelvis and left knee. (Plaintiff's Statement of Facts as to which No Genuine Issue Remains to be Tried ("PSMF") [8] at ¶ 4; Defendant's Response to Plaintiff's Statement of Fact as to which No Genuine Issue Remains to be Tried ("Def.'s Response to PSMF") [18] at ¶ 4.)   Plaintiff's hip bones were so splintered and fragmented that many of the pieces could not be used during plaintiff's surgical reconstruction. (*Id.*; A.R. at 504-502.)   Additionally, plaintiff's right ankle was struck with such force that the majority of his talus or heel bone was ejected out of his foot and into the passenger floor board of the vehicle he was driving. (PSMF at ¶; Def.'s Response at

---

[1]   The administrative record is numbered with the prefix LIN CL 0###, In this Order the Court uses only the last three digits of the administrative record numbering, *i.e.*, LIN CL 0825 becomes A.R. 825.

AO 72A
(Rev.8/82)

¶ 4; A.R. at 301.)  As of December 3, 2003, plaintiff had undergone various surgeries to address his injuries.  (*Id.*)  Defendant does not dispute the fact that, to date, plaintiff remains disabled.[2]  (PSMF at  ¶ 5; Def.'s Response to PMSF at  ¶ 15; Ans. at  ¶ 15.)

At the time he was rendered disabled, plaintiff was the "Senior Vice President-Practice Area Leader" for Technology Solutions Company ("TSC") a consulting company in the information technology industry. Among other demands, the position required extensive business travel. (PSMF at ¶ 5; Def.'s Response to PSMF at ¶5; A.R. at 216-215.)  After the May 2002 accident, and expiration of the relevant waiting period under the Plan, defendant accepted plaintiff's claim for benefits and began paying LTD benefits in the amount of $22,167.00 per month. (*Id.* at ¶ 6; A.R. at 772.)

Plaintiff filed suit in the Superior Court of Fulton County, State of Georgia against the driver of the vehicle with which plaintiff collided, Matthew Thomas Steinmetz ("Steinmetz"), and his employer, Beers Skanska, Inc. ("Beers") (PSMF at ¶ 9; Def.'s Response to PSMF at ¶  9; A.R. at 733-732.)  In the state action, plaintiff sought damages for his medical bills (past, present, and future), lost wages (past, present, and future) and pain and suffering. (PSMF

---

[2]   At one time defendant did dispute this fact.  Indeed, on January 27, 2004, defendant sent plaintiff a letter terminating benefits as of January 11, 2004.  On October 26, 2004, defendant reinstated plaintiff's total disability benefits after plaintiff timely appealed the benefits decision. (A.R. at 233, 548, 771; PSMF at ¶ 6.)

4

at ¶ 9; Def.'s Response to PSMF at ¶  9.)  After five days of trial, in December 2004, the parties agreed to settle for $5 million. (*Id.* at ¶ 10; Def.'s Response to PSMF at ¶ 10; A.R. at 733-710.)  After accounting for attorney's fees, costs and $25,000, to be placed in escrow, the net proceeds distributed to plaintiff equaled $3,087,194.21. (Defendant's Statement of Undisputed Material Facts ("DSMF") [12] at ¶ 12; Plaintiff's Statement of Facts as to Which a Genuine Issue Remains to be Tried ("Pl.'s Response to DSMF") [15] at ¶ 12; A.R. at 878).  All but $1 million of the $5 million settlement was paid at the time of settlement.  According to the terms of the settlement, the last $1 million is to be paid in periodic payments of $6,435.00, guaranteed for 20 years and beginning on July 1, 2005, with the last payment on June 1, 2025. (DSMF at ¶ 10; Pl.'s Response to DSMF at ¶ 10; A.R. at 729.)

As defendant admits, the settlement reflected a serious compromise by Mr. Smith, born out of concern that the jury might find the driver's employer not liable, leaving only the driver's personal insurance of $250,000 to pay any judgment. (PSMF at ¶ 10; Def.'s Response to PSMF at ¶ 10.)  At the time of the settlement, plaintiff had already incurred medical expenses in the amount of $516,175.69. (PSMF at ¶ 12; Def.'s Response to PSMF at  ¶ 12; A.R. at 708-707.) In addition, plaintiff's expected future medical expenses were calculated by licensed vocational rehabilitation consultants and a

doctor of economics who valued the cost of plaintiff's expected future health and medical costs in the range of $1,123,471 to $5,588,804. (PSMF at ¶ 13; Def.'s Response to PSMF at ¶ 13; A.R. at 705-704.)   A separate report, prepared by a professor of economics, calculated plaintiff's loss in earning capacity at $14,079,411.98, reduced to present value, and assuming plaintiff would have continued working until age 65.   (PSMF at ¶ 14; Def.'s Response to PSMF at ¶ 14; A.R. at 863-847.)

On March 15, 2005, after terminating plaintiff's benefits in January 2004 (A.R. at 233) and then reinstating those same benefits in October 2004 (A.R. at 548), defendant began inquiring whether plaintiff had received any third-party funds as a result of the accident.   (PSMF at ¶ 6, 8; A.R. at 580.)   By letter dated April 7, 2005, plaintiff advised defendant that he had recovered a settlement from a third party as a result of the accident. (Id. at ¶ 8; A.R. at 748-704.)   The April 7, 2005 letter also expressed plaintiff's position that Mr. Smith had not received anything, other than his social security benefits, that would qualify as "Other Income Benefits" so as to reduce the amount of plaintiff's LTD benefit award. (A.R. at 745.)   In support of this position, plaintiff relied on both the "common fund" and "make whole" doctrines. (Id. at 748-704; DSMF at ¶ 16; Pl.'s Response to DSMF at ¶ 16.)

On May 31, 2005, defendant made an offer to plaintiff to pay a

6

lump sum settlement ("the lump sum") of $1.4 million in full discharge of any further obligation to pay monthly benefits under the policy. (DSMF at ¶ 18; Pl.'s Response to DSMF ¶ 18; A.R. at 672-669.) Defendant based the lump sum offer on a 5.48% discount rate and a range of scenarios, which placed the present value of plaintiff's benefits with the social security offset at somewhere between $1.9 and $2.9 million, depending on whether or not an offset was taken for the settlement. (A.R. at 671.) On June 6, 2005, plaintiff's attorney indicated that he could not properly evaluate the lump sum until he could understand defendant's grounds for taking an offset for the settlement. (DSMF at ¶ 20; Pl.'s Response to DMSF at ¶ 20; A.R. at 679.) On June 8, 2005, plaintiff rejected the lump sum. (*Id.* at ¶ 21; A.R. at 896-895.)

On June 13, 2005, defendant informed plaintiff of its decision to reduce plaintiff's LTD benefits from $22,167.00 per month to $50.00 per month based on the settlement.[3] (PSMF at ¶ 18; Def.'s Response to PSMF at ¶ 18; A.R. at 680A-681.) In this letter, defendant also requested that plaintiff review the "Other Income Benefits" provision of the plan. Under the "Other Income Benefits"

---

[3] Part of the reduction in plaintiff's disability benefits was also based on an estimate of plaintiff's social security disability benefits. The Court does not focus its attention on this portion of the reduction as the social security offset is not at issue in the present action. Plaintiff does not challenge defendant's right to take an offset for plaintiff's social security benefits.

provision, "[a]n employee for whom disability benefits are payable under this policy may be eligible for benefits from Other Income Benefits.   If so, the Insurance Company may reduce the disability benefits by the amount of such other income benefits."   Under the terms of the Plan, "Other Income Benefits" include: "2. any Social Security disability or retirement benefits the Employee or any third party receives..."  "5. Any amounts paid because of loss of earnings or earning capacity through settlement, judgment, arbitration or otherwise..."  (A.R. at 695-694.)

On June 16, 2005, plaintiff appealed defendant's benefit reduction decision reiterating plaintiff's position that the make whole doctrine precluded defendant from offsetting the third-party settlement. (PSMF at ¶ 19; Def.'s Response to PSMF at ¶ 19; A.R. at 812-13.)  On August 23, 2005, defendant advised plaintiff that it had considered his appeal and affirmed its decision to reduce plaintiff's benefits to $50.00 per month based on the settlement. (PSMF at ¶ 20; Defendant's Response to PSMF at ¶ 20; A.R. at 901-898.)   Defendant also expressed its position that the make whole and "common fund" doctrines did not apply to plaintiff's situation.   (A.R. at 899.) Defendant informed plaintiff that based on the provisions in the Plan, defendant was entitled to offset plaintiff's monthly disability benefit by "certain monies received by Mr. Smith in a personal injury settlement."  (Id. at 901.)  Defendant cited the "Disability Benefit

8

Calculation" provision, which provides that "The Monthly Disability Benefit for any month the Employee is Disabled is the Gross Disability Benefit minus Other Income Benefits..." (*Id.*) Defendant then cited the "Other Income Benefits" provision, as well as the "Lump Sum Payments" provision. Under the "Lump Sum Payments" provision, "Other Income Benefits or earnings paid in a lump sum will be prorated over the period for which the sum is given. If no time is stated, the lump sum will be prorated over five years. If no specific allocation of a lump sum payment is made, then the total payment will be an Other Income Benefit." (*Id.* at 901-900.) LINA informed plaintiff that "The Other Income Benefits provisions prevent the claimant from receiving a double recovery of benefits", and that LINA was entitled to set off $3,087,194.21. (*Id.* at 899.)

Two days later, on August 25, 2005, plaintiff filed this lawsuit. (Compl. at 1.) Plaintiff and defendant have filed cross-motions for summary judgment that are now before this Court. Both motions for summary judgment ask the Court to decide the same basic issue of law: to wit, whether defendant is entitled to reduce plaintiff's LTD benefits as a result of proceeds from the settlement. Because both motions ask the Court to decide the same issue and there are no genuine disputes of material fact the Court will consider them together.

9

## DISCUSSION

### I.    Summary Judgment Standard

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* at 322-23.

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323; *Apcoa, Inc. v. Fidelity Nat'l Bank*, 906 F.2d 610, 611 (11th Cir. 1990). The movant is not required to negate his opponent's claim, however. The movant may discharge his burden by merely "'showing'--that is, pointing out to the

10

district court--that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  After the movant has carried his burden, the nonmoving party is then required to "go beyond the pleadings" and present competent evidence[4] designating "'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting FED. R. CIV. P. 56(e)).  While the court is to view all evidence and factual inferences in a light most favorable to the nonmoving party, *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236 (11th Cir. 2003), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A fact is material when it is identified as such by the controlling substantive law.  *Id.* at 248.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Id.* at 249-50.  The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith*

---

[4]   The nonmoving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Celotex*, 477 U.S. at 324.

11

*Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted).   An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson*, 477 U.S. at 249-50.   Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of *every* element material to that party's case so as to create a genuine issue for trial.

## II.   Standard of Review

Plaintiff brings this action as a beneficiary of an ERISA plan against defendant's claims administrator, LINA, seeking legal and equitable relief allegedly due to him under the terms of his long term disability plan.   29 U.S.C. § 1132(a)(1)(B)(2005).   In addition, plaintiff seeks equitable relief under 29 U.S.C. § 1132(a)(3). Though ERISA does not establish the standard of review for decisions of a plan administrator, in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), the Supreme Court held that a court must review the denial of ERISA benefits *de novo* unless the benefit plan confers discretionary authority upon the plan administrator to determine eligibility or to construe terms of the plan.   *Id*.   However, the Supreme Court did not determine the appropriate standard of review for a plan administrator's decision in cases where there is a conflict of interest.

12

After *Firestone*, the Circuit Courts developed various approaches to determine the appropriate standard of review when an ERISA beneficiary or plan participant claims that a plan administrator has wrongfully denied benefits under the plan. The Eleventh Circuit has established three distinct standards for reviewing the decisions of an ERISA plan administrator "'(1) *de novo* where the plan does not grant the plan administrator discretion; (2) arbitrary and capricious [where] the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interest.'" *HCA Health Servs. of Georgia, Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 993 (11th Cir. 2001); *Buckley v. Metro. Life*, 115 F.3d 936, 939 (11th Cir. 1997).

The Eleventh Circuit has further developed a unique five-step, burden-shifting method when evaluating an administrator's decision.[5]

---

[5]   (1) The court must determine if the plan documents grant the administrator discretion to interpret "disputed terms." *HCA*, 240 F.3d. at 993.   If the court finds that the documents do not grant discretion to the administrator, it will review the decision *de novo*, and not proceed to the remaining steps.   If the court finds that the documents grant discretion, it will apply either an arbitrary and capricious or heightened arbitrary and capricious standard and move onto step two.   *Id*.

(2) Regardless of whether the arbitrary and capricious or heightened arbitrary and capricious standard applies, the court evaluates the administrator's decision *de novo* to determine if it was "wrong." *Id*. at 994 (internal citations omitted).   Wrong is the "label," which signifies the conclusion a court reaches after conducting a *de novo* review and determining that it disagrees with the claim administrator's plan interpretation. *Id*. at 993 n.23.

13

At each of these steps, the court makes a determination that results in progression to the next step or the end of the inquiry. *HCA*, 240 F.3d at 993.

The court must examine the "plan documents to determine whether the plan documents grant the claims administrator discretion to interpret disputed terms." *HCA,* 240 F.3d at 993. In order to trigger the heightened standard of review, the plan "language conferring discretion on the administrator must be 'express language unambiguous in its design.'" *Hunt v. Hawthorne Assocs., Inc.*, 119 F.3d 888, 912 (11th Cir. 1997) (quoting *Kirwan v. Marriot Corp.*, 10 F.3d 784, 789

---

(3) If the court determines that the claim administrator's decision was "wrong", the court proceeds to decide if the claimant made a "reasonable" interpretation of the plan. *Id.* at 994 *(*citing *Lee v. Blue Cross/Blue Shield*, 10 F.3d 1547, 1550 (11th Cir. 1994)).

(4) The court then must determine whether the claim administrator's wrong interpretation is reasonable. *Id.* If the court determines that the administrator's decision is wrong, but reasonable, this interpretation is entitled to deference. *Id.*

(5) Next, the court must evaluate the self-interest of the claims administrator. If there is no conflict of interest, the claim administrator's wrong, but reasonable interpretation, will not be found arbitrary and capricious. If a conflict exists, the court will review the administrator's decision under a "heightened arbitrary and capricious" standard. Under this standard, the burden shifts to the claim administrator to demonstrate that its interpretation of the plan is not tainted by self-interest. *Id.* at 994-995. The claims administrator satisfies this burden by demonstrating that its decision benefits the class of participants and beneficiaries. However, even if the claim administrator can satisfy this burden, the claimant may still be successful if he/she can demonstrate that the administrator's decision was otherwise arbitrary and capricious. *Id.* at 995.

(11th Cir. 1994).

Defendant argues that the heightened arbitrary and capricious standard applies because the plan grants LINA discretionary authority to determine eligibility under the Plan. (Def.'s Summ. J. at 9.)  At the same time, defendant admits that since LINA is both the claims administrator and the issuer of benefits under the Plan, the court should apply the heightened arbitrary and capricious standard. (*Id.* at 12.)

Specifically, defendant relies on the following language in support of its position that the Plan documents grant the plan administrator discretion: (1) the insured "must provide the Insurance Company, at his or her own expense, satisfactory proof of Disability before benefits will be paid" (A.R. at 696); (2) LINA "will, from time to time, review the Employee's status and will require satisfactory proof of earnings and continued disability" (*Id.* at 695); (3) "The Insurance Company will require continued proof of the Employee's Disability for benefits to continue" (*Id.* at 700); and (4) benefits will end "the date the Insurance Company determines he or she is not Disabled" ( *Id.* at 690.)

Though defendant might successfully argue that one or more of these provisions grant discretionary authority to LINA to determine whether a plan participant is "disabled," these provisions do not confer any discretion on LINA to determine the dispute at issue here:

15

to wit, how the "set-off" provisions of the Plan should operate. *See HCA*, 240 F.3d at 993, holding that a court looks to the documents to determine if they grant the claims administrator discretion to interpret " *disputed terms*." (emphasis added). As the Supreme Court in *Firestone* held, trust principles provide the framework for determining the appropriate standard of review. Under this framework, a deferential standard of review is appropriate when a trustee exercises discretionary authority, which is vested in the instrument under which the trustee acts. *Firestone*, 489 U.S. at 111. The Supreme Court further explained that "'The extent of the duties and powers of a trustee is determined by the rules of law that are applicable to the situation, . . . and by the terms of the trust *as the court may interpret them.*'" *Id.* at 112 (quoting 3 W. Fratcher, Scott on Trusts § 201 at 221)(emphasis in original). Under these guiding principles, the deferential standard is only appropriate where the plan administrator is granted power to construe disputed or doubtful terms.

Here, the Plan provisions, which defendant cites as granting discretionary authority to the plan administrator, do not relate to the disputed terms of the Plan. All four provisions relate to the determination of disability, which is not at issue in this case. Rather the provisions in dispute are the "Other Income Benefits" and "Lump Sum Payments" provisions of the plan. The provisions cited

16

above do not grant the administrator any discretionary authority to determine whether the "Other Income Benefits" provision is applicable in a particular situation.   Nor does the Plan grant the plan administrator general power to construe the terms of the Plan. Because the Plan does not give the plan administrator discretion to interpret the provisions at issue, the court will analyze this administrator's decision *de novo*.  However, it should be noted, that even if this Court applied the heightened arbitrary and capricious standard, it would reach the same conclusion.

III.        **Plaintiff's Motion to Strike Portions of the Affidavit of James (sic) Lodi is Denied as Moot**

In support of its Motion for Summary Judgement, defendant submitted the affidavit of Richard Lodi, a Senior Operations Representative at LINA.  ("Lodi Aff." attach. as Ex. 1 to Def.'s Summ. J. [12].)[6]  A motion to strike is not the proper vehicle for challenging the admissibility of evidence set forth in an affidavit. Rather, plaintiff should have filed a notice of objection to the challenged testimony.  *See Jordan v. Cobb County, Geogia*, 227 F. Supp. 2d 1322, 1346 (N.D. Ga. 2001).  Nevertheless, the Court will overlook this procedural error and determine the admissibility of defendant's proffered evidence.

---

[6]  The Court notes that Plaintiff's Motion to Strike Portions of Affidavit of James Lodi ("Pl.'s Mot. to Strike Lodi Aff." [16]) incorrectly referenced Richard Lodi as James Lodi.

17

The Court has reviewed the affidavit, which contains little more than an explanation of the mathematic computations that the defendant made in denying plaintiff's claim, in addition to conclusory statements that the defendant correctly denied the claim. The Court disregards the latter. As the former does not alter the Court's ultimate conclusion that defendant was wrong to deny plaintiff's claim, it **DENIES as moot** plaintiff's Motion to Strike Portions of Affidavit of James Lodi [16].

**IV. LINA's Decision to Off-Set Plaintiff's Monthly Disability Benefits Due to a Third-Party Settlement That Failed to Fully Compensate Plaintiff Was "Wrong"**

**A. ERISA Federal Common Law Prevents LINA From Off-Setting Plaintiff's Third-Party Settlement**

In support of its motion for summary judgment, defendant argues that the language of the Plan requires defendant to off-set plaintiff's LTD disability benefits to reflect plaintiff's receipt of a personal injury settlement. (Def.'s Summ. J. at 1.) Defendant's position is that the off-set was mandated by the plain meaning of the Plan language.

First, defendant cites the "Disability Benefit Calculation" provision, which states that "the monthly disability benefit for any month will reduced by the amount of any "Other Income Benefits." (A.R. at 699.) Second, the term "Other Income Benefits" is defined by the Plan to include "any amounts paid because of loss of earnings or earning capacity through settlement . . .where a third party may

18

be liable, regardless of whether liability is determined". (A.R. at 695.)  According to defendant, the settlement plaintiff received as a result of the state court action qualifies as an "Other Income Benefits" because it is a settlement received from a third party because of plaintiff's "loss of earnings or earning capacity."

Defendant then argues that the settlement proceeds were not allocated so as to define the amount or amounts attributed to loss of earnings or earning capacity, nor was the settlement prorated over a set period of time.  (Def.'s Summ. J. at 12-13.)  According to defendant, this lack of allocation and proration triggers application of the "*Lump Sum Payments*" provision of the "Other Income Benefits" section of the Plan. The "*Lump Sum Payments*" provision provides, first, that "Other Income Benefits or earnings paid in a lump sum will be prorated over the period for which the sum is given.  If no time is stated, the lump sum will be prorated over five years . . ." (A.R. at 694.) The "*Lump Sum Payments*" provision also provides that "[i]f no specific allocation of a lump sum payment is made, then the total payment will be an Other Income Benefit."  (*Id.*)

Because the settlement does not provide a time period for prorating the settlement and because the settlement proceeds were not allocated so as to define the amount or amounts attributed to loss of earnings or earning capacity, defendant contends that the "*Lump Sum Payments*" provision directs that the total settlement be

19

considered an "Other Income Benefit," to be prorated over a five-year period.   Defendant's reasoning takes plaintiff's net settlement proceeds of $3,087,194.21 as the amount to be prorated and prorates that amount on a monthly basis over five years for a monthly off-set of $51,453.24 per month.   As plaintiff's monthly disability benefit is only $22,167.00, the prorated settlement amount exceeds that benefit amount and generates a negative figure due plaintiff.   As the Plan provides for a minimum monthly disability benefit of $50, however, plaintiff is entitled to LTD benefits in the amount of $50 per month, post-off-set, for a period of five years, according to defendant.   After this five-year period, plaintiff is entitled to resume receipt of full benefits (less off-set for social security benefits). (Def.'s Summ. J. at 2-3, 5, 8-9, 12-13; A.R. at 898-901.)

Plaintiff, on the other hand, argues that despite the Plan language cited by the defendant, defendant may not off-set his disability benefits because he has not been "made whole" by his third-party settlement. Specifically, plaintiff submitted evidence that the medical expenses he incurred by the time of trial equaled $516,175.69 (A.R. at 708-707); that, based upon a report prepared by a certified life care planner, his expected future medical expenses ranged between $1,123,471.00 and $5,588,804.00 (A.R. at 875); that, according to a professor in economics, his future loss in earning capacity, was expected to be in the range of $14,079,411.49 in

AO 72A
(Rev.8/82)

present value dollars (A.R. at 852); and that his net third-party recovery was only $3,087,194.21 (A.R. at 712).

Defendant did not submit any contrary evidence or refute these calculations.   LINA also admits that at the time of plaintiff's trial, plaintiff had incurred medical bills totaling $516,175.69 (Def.'s Response to PSMF at ¶ 12); that plaintiff's expected future medical expenses, as determined by a certified vocational rehabilitation consultant, ranged between $1,123,471.00 and $5,588,804.00 (*Id.* at ¶ 13); and that assuming plaintiff worked until age 65, an economist determined that his projected loss in earnings and fringe benefits, reduced to present value, would be valued at $14,079,411.98.   (*Id.* at ¶ 14).   Thus, using the most conservative calculation of damages for each of the above categories of damages, plaintiff's economic losses, including medical expenses and loss of earnings, would greatly exceed his third-party settlement.   Indeed, assuming that plaintiff's future medical expenses would fall in the middle of the expert's projection--i.e., at around $3,356,137--plaintiff's past ($516,175) and future medical expenses, alone, would total $3,872,313, which exceeds, by itself, the settlement amount of $3,087,194.21 that he received.

LINA also performed its own series of calculations regarding the present value of plaintiff's disability claim based on various assumptions using a 5.48 percent interest rate.   Based on LINA's

calculations, if plaintiff received his full benefits ($22,167.00) until age 65, his claim would be worth approximately $3.2 million. (A.R. at 671).    If plaintiff received his full benefits minus a Social Security award until age 65, he would receive $2.9 million. (*Id.*)    Thus, even aggregating the full disability benefit (3.2 million) with the third-party settlement ($3,087,194.21), plaintiff would still not be fully compensated for his loss.

Despite the language of the Plan, the federal common law make whole doctrine precludes LINA from off-setting its monthly disability benefits. Under the make whole doctrine, "an insured who has settled with a third-party tortfeasor is liable to the insurer-subrogee only for the *excess* received over the total amount of his loss." *Guy v. Southeastern Iron Workers' Welfare Fund*, 877 F.2d 37, 39 ([11th] Cir. 1989) (citing *Couch on Insurance* 2d 16 § 60.50 (1983)).    Under Supreme Court precedent, federal courts have the power, under certain circumstances, to apply common law doctrines in ERISA actions. *See Firestone*, 489 U.S. 101 (directing the federal courts to develop a federal common law of rights and obligations under ERISA).

In *Cagle v. Bruner*, 112 F. 3d 1510, 1521 ([11th] Cir. 1997), the Eleventh Circuit Court of Appeals specifically recognized the make whole doctrine as part of the federal common law. The "make whole" doctrine operates as a default rule, which limits a plan's subrogation rights where an insured has not received full

22

compensation for his total loss and the plan has not explicitly precluded operation of the doctrine. *Id.* Because the make whole doctrine is a default rule, the parties can freely contract out of it. To effectively contract out of the default rule, an ERISA plan must include language "'specifically allow[ing] the Plan the right of first reimbursement out of any recovery [the participant] was able to obtain even if [the participant] were not made whole.'" *Id.* at 1522 (quoting *Barnes v. Indep. Auto. Dealers Ass'n of Cal.*, 64 F.3d 1389, 1395 (9th Cir. 1995)). If the plan does not include language explicitly providing the fund with a right to first recovery even when a participant or beneficiary is not made whole, the fund cannot avoid the application of the make whole doctrine. Standard subrogation language providing the fund the right to seek repayment of settlement or other funds obtained from a third party is not a sufficient explicit rejection of the make whole doctrine. *Id.* at 1521; *see also Guy*, 877 F.2d at 38-39 (applying the make whole doctrine despite the fact that the plan included standard reimbursement language); compare *Great-West Life & Annuity Ins. Co.*, 192 F. Supp. 2d 1376, 1380 (Md. Ga. 2002) (plan language stating that the fund's lien rights will not be reduced "due to the covered person not being made whole" was sufficient rejection of the make whole doctrine).

AO 72A
(Rev.8/82)

In the present case, the Plan includes the following language regarding reimbursement/subrogation:

> "An Employee for whom Disability Benefits are payable under this Policy may be eligible for benefits from Other Income Benefits. If so, the Insurance Company may reduce the Disability Benefits of such Other income Benefits."   "Other Income Benefits" include: "2. any Social Security disability or retirement benefits the Employee or any third party receives...5. any amounts paid because of loss of earnings or earning capacity through settlement, judgment, arbitration or otherwise..."   (A.R. at 695-694).

This language is standard subrogation/reimbursement language, which does not explicitly reject the make whole doctrine.  LINA could have inserted language foreclosing the operation of the doctrine; however, by not doing so, it cannot now protect itself from its force.  Furthermore, LINA does not attempt to argue that the Plan sets forth clear language rejecting the make whole doctrine.

Defendant, however, argues that the make whole doctrine does not apply to plans that are funded by insurance policies.  Instead, defendant argues that for plans funded by insurance polices, the make whole doctrine was codified under O.C.G.A. § 33-24.56.1.  Defendant cites no legal authority for this assertion, nor does the Court find any support for this argument.  Rather, the state statute operates as an alternate form of relief under state law for participants/beneficiaries operating under an insurance contract.

24

However, the make whole doctrine is equally applicable to those with insurance contracts and those without.

Defendant also claims that the make whole federal common law doctrine does not apply in this situation because defendant is not seeking a "reimbursement," but rather seeking to off-set future benefits owed under the Plan. However, any attempt to distinguish off-sets from reimbursement/subrogation is without force in this context. The make whole doctrine simply holds that an insured who has settled with a third-party tortfeasor is liable to the insurer-subrogee only for the excess received. The make whole doctrine does not draw a distinction between reimbursement and off-sets. Here, if LINA were entitled to reduce plaintiff's monthly benefits, plaintiff would not be fully compensated for his loss, and in essence would be liable to the insurance company. Thus, such an off-set would run afoul of federal common law policy that an insured is only liable for the "excess" received over the total amount of his loss.

Thus, the make whole doctrine is applicable in this context, and prevents LINA from taking an off-set. The administrator's decision, which failed to take this doctrine into account was "wrong", and cannot survive *de novo* review.[7]

_____

[7]Furthermore, LINA's decision would not survive a heightened arbitrary and capricious standard. Without going through all five steps, it is noted that the administrator's decision is not reasonable because it does not comport with the federal common law. Even if it were reasonable, the decision would not benefit the plan participants/beneficiaries, and would be otherwise arbitrary and

### B.   O.C.G.A § 33-24-56.1 Prevents LINA from Off-Setting Plaintiff's Benefits

LINA is further prevented from off-setting plaintiff's monthly disability under Georgia's anti-subrogation statute. *See* O.C.G.A. § 33-24-56.1 (2004).    Under O.C.G.A. § 33-24-56.1, benefit providers, including administrators of employee benefit plans, may seek reimbursement of medical expenses paid on behalf of an injured party in the event of a recovery from the personal injury from a third party. *Id.* at § 33-24-56.1(b). However, the benefit provider may require reimbursement only if the amount of recovery exceeds the sum of all economic and non-economic losses incurred as a result of the injury. O.C.G.A. § 33-24-56.1(b)(1). Furthermore, the amount of the reimbursement claim must be reduced by the pro rata amount of attorney's fees and expenses of litigation incurred by the injured party. *Id.* at § 33-24-56.1(b)(2).

Thus, in order for LINA to off-set plaintiff's third-party settlement, plaintiff's recovery, after attorney's fees and litigation expenses, must exceed his economic and non-economic losses.   As noted *supra*, the uncontroverted evidence demonstrates that even under the most conservative assessment of damages, plaintiff will not be fully compensated if he receives his third-party settlement and his full disability benefit until age 65. Despite this evidence, defendant offers a very technical reading of

capricious.

26

the word "reimbursement" in the Georgia anti-subrogation statute, and argues that only reimbursements, and not off-sets, are covered by the statute.

Defendant specifically cites *Yates v. Dean*, 244 Ga. App. 333; 535 S.E.2d 335 (2000) for the proposition that the Georgia anti-subrogation statute applies only in the case of a "reimbursement" and not where the insurer is attempting to off-set its monthly disability payments.  In *Yates*, tort victims sued their uninsured motorist insurer for benefits allegedly due to them under their policy.  The Yates also sued the driver of the vehicle with which they collided, and the jury returned a verdict in favor of the Yates.  During this trial, State Farm presented evidence that it had previously paid the Yates for their medical bills.  Thus, the insurer was permitted to reduce its payment on the verdict by the amount of the medical bills it had actually paid.

The *Yates* court did not, as defendant asserts, allow the set-off because of any technical distinction between off-sets and reimbursements, nor because it dealt with a past payment.  Instead, the Court merely viewed the off-set as a way to prevent a double-recovery for plaintiff.  *Id.* at 334-36.  In the present case there can be no argument that plaintiff will receive a double recovery if he retains the full settlement and his full disability benefits.

27

Similarly, defendant relies on *Iglinsky v. Richardson*, 433 F.2d 405 (5th Cir. 1970), a Fifth Circuit case, which does not deal with an anti-subrogation statute, for the proposition that a claimant receiving both Social Security benefits and Workmen's Compensation should not receive double compensation. Similarly, this case lends no support for defendant's argument because plaintiff would not receive a double recovery if he received his full disability benefits.

Defendant also relies on *Whitlinger v. Cont'l Cas. Co.*, 129 F. Supp. 2d 924 (E.D. Va. 2001), to support its off-set vs. reimbursement/subrogation argument. First, it should be noted that *Whitlinger* is not persuasive, much less binding on this court. Additionally, the *Whitlinger* court held that Virginia's anti-subrogation statute was not applicable because subrogation was not at issue in the case. In other words, the insurer was not attempting to step in the shoes of the insured in order to recover from the third party who caused the injury. *Id.* at 932. Rather, the insurer only attempted to reclaim money it had paid to the insured. This holding does not provide support for defendant's argument because plaintiff is not arguing that LINA is attempting to subrogate. Rather, plaintiff argues that LINA is not entitled to reduce his benefits under O.G.C.A. § 33-24-56 (b).

28

Furthermore, the *Whitlinger* court does not distinguish off-sets and reimbursements.  Rather, the court held that subpart (B) of the statute, which pertains to repayment and not subrogation, is inapplicable because it only applies to hospital, medical, surgical and similar or related benefits, and not disability insurance.  *Id*. at 933.  Because plaintiffs were seeking disability insurance, the Virginia statute could not afford them any relief.  This case is inapposite since the Georgia statute applies to disability insurers.

Interestingly, the very case that defendant relies upon also states that, in reading the anti-subrogation statute, one should not draw technical distinctions between off-sets and exclusions.  The anti-subrogation statute provided that the statue "shall not prohibit an exclusion of benefits paid or payable under workers' compensation laws or federal or state programs..."  *Id*. at 933 (citing Va Code Ann. § 38.2-3405 (1999 Rep. Vol. & 2000 Cum. Supp.).  The insured argued that the statute only applied to an "exclusion" of benefits, and not a repayment by the insured where the insurer initially overpaid the claim.  The court held that this would not be a proper result as it would elevate form over substance.  *Id*.  Similarly, a  distinction between off-sets and reimbursement would elevate form over substance.

Defendant also cites *Landrum v. State Farm Mut. Auto. Ins. Co.*, 527 S.E.2d 637, 241 GA App. 787 (Ga. App. 2000) for the proposition

AO 72A
(Rev.8/82)

that a claim against future benefits is not covered by the Georgia anti-subrogation statute.    In *Landrum*, the court held that the Georgia anti-subrogation statute was not applicable since the injured party released the tortfeasor after a jury finding in his favor. Subrogation, therefore, would not deprive the insured of any priority because he had no further claim against the tortfeasor. As the court explained "State Farm is not asserting priority to any part of [plaintiff's] actual or potential recovery.  Consequently, this is not a contest between the insured and the insurer which could result in the insured going unpaid to some extent." *Id*. at 789.  Thus, this case did not present a situation in which plaintiff failed to receive full compensation for his claim.

Similarly, LINA is mistaken in its reliance on *Thompson v. Federal Express Corp.*, 809 F. Supp. 950 (M.D. Ga. 1992).    In *Thompson*, the Court held that an injured party could not argue that he had not been fully compensated because he singed a general release with the third-party tortfeasor.    Though defendant cites this case as support for a rejection of the make whole doctrine, this case did not arise in the context of an O.G.C.A. § 33-24-56.1 claim, which sets forth the framework for determining when a benefit provider may require reimbursement from an injured party. Specifically, subsection (c) of the statute provides "*If the court determines* that the settlement does not fully and completely

30

compensate the injured party, the benefit provider has no right to reimbursement." *Id.* (emphasis added). The conditional language indicates that the Georgia legislature recognized that there are instances when settlement agreements do not fully compensate tort victims. There are many factors which may influence an injured party to settle for less than the full amount of his/her losses. For instance, plaintiffs may have concerns regarding the defendant's liability or solvency.

Not only does the case law indicate that the Eleventh Circuit draws no technical distinction between off-sets and reimbursement/subrogation, O.C.G.A. § 33-24-56.1(f) specifically states that benefit providers may not ". . . withhold or set off insurance benefits as a means of enforcing a claim for reimbursement." The statute, therefore, renders meaningless any technical difference between set-offs and reimbursement or subrogation. *See also Summerlin v. Georgia-Pacific Corp. Life, Health and Accident Plan, et al.*, 366 F. Supp. 2d 1203, 1208 (M.D. Ga. 2005), holding that if ERISA does not preempt O.C.G.A. § 33-24-56.1, ". . . Defendants would not be entitled to seek reimbursement [from the plaintiff] or to set off the amount the Plan paid on behalf of [plaintiff] against the Plaintiff's benefits." Though the insurer had already made a payment under the Plan, and wished to off-set future benefits because of the past payment, the principle

31

is nonetheless the same: an insurer should not be permitted to off-set past or future payments until the insured is fully compensated.[8]

LINA's interpretation of the Plan language, in light of the anti-subrogation statute is not reasonable.   If the insurance company were permitted to off-set its future benefits as a result of the third-party settlement, plaintiff would not receive full compensation for his injuries, and the defendant insurance company would receive a windfall.   This is antithetical to the policy underpinning the Georgia anti-subrogation statute.   As the Georgia Supreme Court explained when it adopted the reasoning of the Alabama Supreme Court regarding the public policy behind the complete compensation rule: "The very heart of the bargain when the insured purchases insurance is that if there is a loss he or she will be made whole.... 'Where either the insurer or the insured must to some

---

[8]Defendant argues in its Memorandum in Opposition to Plaintiff's Motion for Summary Judgment ("Def.'s Memorandum in Opp. To Pl.'s Motion for Summ. J." [17] at pp. 6-7) that O.C.G.A. § 33-24-56.1(f) does not apply to the present case because LINA is merely attempting to coordinate benefits among benefit providers.   O.C.G.A.   33-24-56.1(f) specifically provides that "Nothing in this subsection shall be deemed to prohibit the coordination of benefits between or among benefit providers."   Georgia's anti-subrogation statute specifically defines benefit providers as "any insurer, health maintenance organization, health benefit plan, preferred provider organization, employee benefit plan, or other entity which provides for payment or reimbursement of health care expenses, health care services, disability payments, lost wage payments, or any other benefits under a policy of insurance or contract with an individual or group."   Id. at 33-24-56.1(a)(1).   Under this definition, LINA is not attempting to coordinate with another benefit provider, but rather with a third-party tortfeasor.

32

extent go unpaid, the loss should be borne by the insurer for that is a risk the insured has paid it to assume.'" *Davis v. Kaiser Found. Health Plan of Ga, Inc.*, 521 S.E.2d 815, 818, 271 Ga. 508, 511 (Ga. 1999) (internal citations omitted).

Furthermore, the Georgia Supreme Court held that when part of the Code has been codified from a decision of the court, it should be construed in light of the source from which it came, unless the language of the Code compels a contrary reading.  Because the Georgia Assembly enacted O.C.G.A. § 33-24-56.1 shortly after the Supreme Court's ruling on reimbursement of insurers by insureds, the court held that it enacted the statute in order to state the pre-existing law: that complete compensation is the rule of the state. *Id.*  As outlined above, the public policy behind the complete compensation rule is that an insured should not be liable to the insurer until he/she is fully compensated.  Thus, whether the insured is liable in the form of a claim for future or past benefits under the plan is not the relevant inquiry.  Rather, one must inquire whether the insured was made whole.  Until the insured has received full compensation for his losses, the insurance company cannot benefit, at the expense of the insured, from the insured's settlement against a third-party tortfeasor.  Should the insurance company be entitled to off-set plaintiff's third-party settlement, the insured would not fully recover his economic losses.  Thus, the

33

technical delineation that defendant advances between off-set and reimbursement/subrogation, runs afoul of the policy underpinning O.C.G.A. § 33-24-56.1.

Under defendant's logic, if LINA paid plaintiff a reduced monthly disability up until age 65, which did not ultimately result in full compensation of plaintiff, then plaintiff would be entitled to a reimbursement. However, if the insurance company decides up front, as it did here, to limit plaintiff's disability payments, plaintiff has no cause of action under Georgia's anti-subrogation statute. This draws a technical distinction between past and future benefits unsupported by any case law proffered by defendant, and which is inconsistent with the make whole doctrine codified under O.C.G.A. § 33-24-56.1.

### C.   O.C.G.A. § 33-24-56.1 Is Not Preempted by ERISA

Though defendants are not entitled to set-off plaintiff's future benefits under the complete compensation rule codified in O.C.G.A. § 33-24-56.1, if ERISA preempts the statute, the statute will not prevent defendant from enforcing the language of the Plan.[9] Under 29 U.S.C. § 1144(a), ERISA preempts all state statutes that "relate to any employee benefit plan..." 29 U.S.C. § 1144(a)

---

[9] Again, as discussed *supra*, the Court has concluded that the federal common law default rule, which adopts the make whole doctrine, applies. The Court includes this discussion of state law as an alternative ground for finding defendant's decision denying the claim to be wrong.

34

(1998).  This general rule is limited by subsection (b), commonly referred to as ERISA's "saving clause."  Under subsection (b), a statute that relates to an "employee benefit plan" may not be preempted if it "regulates insurance."  29 U.S.C. § 1144(b).  However, under an exception to the exception, even if state law regulates insurance and falls within the savings clause, ERISA's "deemer clause" may exempt ERISA plans from state regulation.  *See* 29 U.S.C. § 1144(b)(2)(B); *FMC Corp. v. Holliday*, 498 U.S. 52, 61, 111 S. Ct. 403, 407 (1990).  Since O.C.G.A. § 33-24-56.1 relates to ERISA covered plans, the statute will be preempted unless it is saved by ERISA's saving clause.  *See* O.C.G.A. § 33-24-56.1 (benefit provider defined as, *inter alia*, an employee benefit plan).  In addition, the statute will not apply if the plan is exempt by virtue of the deemer clause.

Under the Supreme Court's ruling in *Kentucky Assn. of Health Plans, Inc. v. Miller*, 538 U.S. 329, 341-42 (2003), a law is deemed to "regulate insurance" if it satisfies two requirements.  First the state law must be "specifically directed toward" the insurance industry.  *Id.* at 1479, 341-42.  Second, the state law "...must substantially affect the risk pooling arrangement between the insurer and the insured."  *Id.*

Georgia's anti-subrogation statute is directed toward the insurance industry.  It is located within Title 33, Georgia's

35

Insurance Code.  Furthermore, the statute applies to subrogation and reimbursement of benefits paid by benefit providers under a "policy of insurance or contract with an individual or group."  O.C.G.A. § 33-24-56.1(a); *See also Summerlin*, 366 F. Supp. 2d at 1209, in which the District Court for the Middle District of Georgia held, in dicta, that because  O.C.G.A. § 33-24-56.1 is located in the Insurance Code and because the statute only applies to benefit providers under a "policy of insurance or contract with an individual or group", it is "reasonable to conclude that Georgia 'specifically directed' the statute toward the insurance industry."

Georgia's anti-subrogation statute also satisfies the second prong of the Supreme Court's test, as it affects the risk pooling arrangement between the insurer and the insured.  The statute specifically controls the terms of insurance policies by rendering unenforceable policies and contracts, which contain or incorporate provisions in conflict with the Code.  Because the state law controls the actual terms of the insurance polices, it is a prime example of a law that substantially affects the risk-pooling arrangement between insured and insurer.

The Supreme Court's holding in *FMC Corp.* also compels a finding that Georgia's anti-subrogation statute is not preempted.  In *FMC*, the Supreme Court held that Pennsylvania's anti-subrogation statute regulated insurance because it controlled the terms of insurance

policies by invalidating any subrogation provisions. *Id.* at 61, 498 U.S. at 61.

Finally, the deemer clause does not apply because the Plan is not self-funded. Rather, the plan purchases an insurance policy from an insurance company to satisfy its obligations to plan participants. (A.R. at 703-682). Thus, the instant plan is an insured plan and not captured by the deemer clause.[10]

LINA's interpretation of its policy in light of the anti-subrogation statute is not reasonable. Plaintiff was not made whole by the third-party settlement. Despite the plain language of the Plan, which states that the insurance company may reduce the disability benefits by other income benefits, which include any amounts paid because of loss of earnings or earning capacity through settlement, defendant cannot reduce plaintiff's disability benefit because of the third-party personal injury settlement. (A.R. at 826-825.) The Georgia anti-subrogation statute specifically provides that an insured must be fully compensated before an insurer can seek recovery. This statute ensures full compensation, while preventing a double-recovery for the insured. Though defendant seeks to draw a technical distinction between reimbursement and off-set, such a delineation elevates form over substance. Because the

---

[10] Defendant LINA does not argue that Georgia's anti-subrogation statute is preempted. *See* Def.'s Mem. in Opp. to Pl.'s Mot. for Summ. J." [17] and Def.'s Mot. for Summ. J. [12].

third-party settlement did not fully compensate plaintiff, plaintiff is entitled to his full monthly disability payment until he reaches the age of 65, or until he is no longer disabled under the plan.

## V. Equitable Relief Under § 1132(a)(3)

Plaintiff has also asserted a claim for equitable relief under § 1132(a)(3) (2005). Specifically, plaintiff asks the Court to enter an Order enjoining LINA from reducing plaintiff's disability benefits based upon his personal injury settlement for so long as he remains disabled as defined by the Plan. Plaintiff has an adequate remedy for his claim under § 1132(a)(1)(B), and, thus cannot alternatively seek redress under 1132(a)(3). *See Katz v. Comprehensive Plan of Group Ins.*, 197 F.3d. 1084, 1088-89 ([11th] Cir. 1999) (an ERISA plaintiff who has an adequate remedy under § 502(a)(1)(B) cannot alternatively plead and proceed under § 502(a)(3)). Under 1132(a)(1)(B), the Court can award back pay to plaintiff and "clarify future rights" to benefits. All of the relief plaintiff seeks is available under § 502(a)(1)(B), and, thus, plaintiff is precluded from proceeding under § 502(a)(3).

## VI. Request for Attorney's Fees

Plaintiff has requested reasonable attorney's fees and litigation expenses for bringing this action. ERISA provides that a court may, in its discretion, award attorney's fees and costs to either party. 29 U.S.C. § 1132(g)(1). The Eleventh Circuit, in

38

*Freeman v. Cont'l Ins. Co.*, 996 F.2d 1116, 1119 (11th Cir. 1993), set out a five-factor test to determine the reasonableness of a request for attorney's fees and litigation expenses. Despite the fact that plaintiff is the prevailing party, the Court will not rule upon this motion until it has received a fee petition from plaintiff detailing: (a) the monetary request for legal costs and attorney's fees; and (b) an analysis as to why plaintiff is entitled to attorney's fees. Plaintiff must file this motion within fourteen (14) days of entry of judgment, per FED. R. CIV. P. 54(d)(2)(B).[11]

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiff's Request for Oral Argument on Defendant's Motion for Summary Judgement [9]; **GRANTS** Plaintiff's Motion for Summary Judgment or, in the Alternative, for Preliminary Injunction [11]; **DENIES** Defendant's Motion for Summary Judgment [12]; **DENIES as moot** Plaintiff's Motion to Strike Portions of Affidavit of James Lodi [16]; AND **GRANTS**

---

[11] Rule 54(d)(2)(B) permits a longer period of time to file a fee petition if "otherwise provided by . . . order of the Court." A brief that adequately analyzes plaintiff's entitlement to attorney's fees may require more than fourteen days to prepare. Likewise, preparation of a detailed memorandum explaining all fees incurred may also require more time.

The Court is willing to allow additional time, if requested, to submit a pleading that thoroughly sets out all pertinent argument and fee information. Any such request for extended time should proffer a "ballpark" estimate of the amount of fees to be requested so that defendant can be made aware of its total exposure in this case, for purposes of deciding whether to file a notice of appeal within the applicable time limit.

Motion to Correct the Reply Memorandum in Support of Defendant's Motion for Summary Judgment [22].

The plaintiff may submit a timely petition seeking attorney's fees, within fourteen (14) days of entry of judgment.


SO ORDERED, this 28 day of September, 2006.


JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

40